627 So.2d 2 (1993)
ROSCHMAN PARTNERS, a Florida general partnership, and John A. Roschman, individually and as General Partner of Roschman Partners, Appellants/Cross-Appellees,
v.
S.K. PARTNERS I., Limited, a Florida limited partnership, Sunbelt Partners, a Florida general partnership and its General Partners, Coojo Investment Co., Nebhart, Inc., individually and as General Partner of Sunbelt Partners, J. Michael Stetson, as Trustee and as General Partner of S.K. Partners I., Limited, and S.K. Partners II., Limited, Appellees/Cross-Appellants.
No. 91-2871.
District Court of Appeal of Florida, Fourth District.
September 29, 1993.
Rehearing, Rehearing and Certification Denied December 30, 1993.
*3 John Beranek of Aurell, Radey, Hinkle & Thomas, Tallahassee, James L.S. Bowdish of Crary, Buchanan, Bowdish & Bovie Chartered, Stuart, and John R. Young of Boose, Casey, Ciklin, Lubitz, Martens, McBane & O'Connell, P.A., West Palm Beach, for appellants/cross-appellees.
Stephen C. Page and David R. Atkinson of Gunster, Yoakley & Stewart, P.A., Stuart, for appellees/cross-appellants.
Rehearing, Rehearing En Banc and Certification Denied December 30, 1993.
POLEN, Judge.
Roschman Partners (Roschman) appeals from an Amended Final Judgment that granted S.K. Partners' (S.K.) prayer for specific performance of an option to buy real property and ordered conveyance of same. S.K. raises two points on cross-appeal, one of which merits discussion.
This case has been pending for over five years and was previously before this court as an appeal from a partial summary judgment entered in S.K.'s favor. See Roschman Properties, Inc. v. S.K. Partners I, 545 So.2d 316 (Fla. 4th DCA 1989). We reversed that summary judgment and remanded for an evidentiary hearing to determine the intent of the parties with respect to a non-recordation clause at the time they executed two agreements. Id. at 317.
S.K., the purchaser, sued Roschman, the seller, for specific performance to compel it to convey certain real property pursuant to an option agreement and sale and purchase agreement that the parties executed in 1981. Roschman defended on the ground that S.K. had materially breached their agreement(s) when it recorded the option agreement in January 1986, in violation of a non-recordation clause contained in the sale and purchase agreement. That clause provided that *4 neither that agreement nor any memorandum thereof could be recorded in any public records and, if so recorded, such recordation would constitute a default by S.K. The option agreement incorporated by reference the non-recordation clause in the sale and purchase agreement and further provided that "[i]n the event of a default by [S.K.] under this Agreement, [Roschman] shall have, solely, the right to terminate this Agreement (and the Option Agreement to which this is attached as an exhibit) ..."
Upon remand from this court's reversal of the partial summary judgment, the trial court conducted an evidentiary hearing on the parties' intent regarding the non-recordation clause and specifically found that the original parties to the Agreement[1] intended that an unauthorized recording of the Option Agreement would constitute a default and that the default would entitle Roschman to terminate the Option Agreement. The court found that the agreement had in fact been violated, but that S.K.'s breach of the agreement was not material, notwithstanding its finding regarding the parties' intent. While we might be troubled by the internal inconsistency of this reasoning, we are mindful that as an appellate court, we must affirm a trial court's order consistent with any theory the record reveals, regardless of the reasons stated in the order under review. See E.G. Green v. First American Bank & Trust, 511 So.2d 569 (Fla. 4th DCA 1987). We hold that there is competent, substantial evidence in the record to support the trial court's conclusion that "[t]ermination of the Option Agreement under the circumstances existing in this case, would constitute an inequitable forfeiture." The trial court ordered specific performance of the Option Agreement on the authority of August Tobler, Inc. v. Goolsby, 67 So.2d 537 (Fla. 1953), and the principle of inequitable forfeiture. While the Tobler Court concluded that under its particular facts,[2] equity would not be served by providing flexibility to the otherwise harsh and rigid principles of the common law of options,[3]see id. at 539, it recognized that the principle of inequitable forfeiture was alive and well and applicable if the facts so required. At bar, unlike Tobler, if the trial court had not compelled specific performance or other equitable relief, Roschman would be unjustly enriched.
In the instant case, the court found that the substantial increase in the subject property's value (from approximately $5 million in 1981 to approximately $18 million at the time of trial) was realized in large part because of S.K.'s successful rezoning of the property, as well as S.K.'s improvements thereon, all while it paid the obligatory property taxes *5 and special assessments. S.K. accomplished this through its hiring of experts and their companies; it also hired attorneys to accomplish the rezoning from residential to commercial. Our supreme court has held that where the optionor stands to receive a windfall if not compelled to perform, and the optionee stands to lose a great deal, equity is served by compelling performance under the contract. See Blackhawk Heating & Plumbing Co., Inc. v. Data Lease Financial Corp., 302 So.2d 404, 410 (Fla. 1974). Accordingly, the trial court's order of specific performance is affirmed.
On cross-appeal S.K. argues that the trial court erred when it ordered S.K. to reimburse Roschman in the amount of $876,833.64 for property taxes that accrued during the first four years of this litigation, after S.K. exercised the option but Roschman refused to close. During that period of time, Roschman held title to the subject property, had exclusive possession of the property and received rents and profits related to activities thereon. This court wrote in Walker v. Benton, 407 So.2d 305 (Fla. 4th DCA 1981):
The general rule, where specific performance is granted of a contract to sell realty, is that the vendor must account to the purchaser for any deprivation of the use of the property from the date when possession should have been transferred, and for any detriment to the property caused by his failure to preserve it properly; as against which the vendor is entitled to credit for any expenses properly incurred by him for improvement or preservation of the property, and for any loss of the use of the purchase money or other consideration from that date.... Obviously, in some instances the purchaser would elect not to seek `rents and profits' since the interest on the purchase price would exceed the value of the `rents and profits'.
Id. at 307 (citation omitted). Thus, a purchaser who seeks specific performance may also seek as damages the rents and profits that accrued to the property during the litigation; and if the purchaser elects to seek such rents and profits, the vendor will then be entitled to offset any monies he expended on the property (e.g., property taxes) against the award of rents and profits. S.K. elected not to pray for damages because the rents and profits generated by the property were relatively small compared to the tax obligations.[4] Furthermore, the actual damages suffered by S.K. would be difficult to quantify and were likely unrecoverable.[5] Apparently, the trial court relied on Palm Beach Estates v. Croker, 106 Fla. 617, 143 So. 792 (1932). Croker, however, is distinguishable; it holds that an order against a vendor for specific performance which orders that the vendor be reimbursed for taxes paid is not an abuse of discretion, where persons exercising the option to purchase were in possession for purpose of sale, where no rents, issues, and profits were realized and the contract apparently contemplated such reimbursement to the vendor. Id. at 801. At bar, quite the opposite is true. However, in light of our affirmance of the trial court's final judgment ordering specific performance of the Option Agreement, equity would not be served by permitting appellees, who upon conveyance will receive the benefit of the property's enhanced value, to avoid payment of the property taxes accrued during this litigation. We therefore affirm.
ANSTEAD, J., concurs specially with opinion.
FARMER, J., dissents with opinion.
ANSTEAD, Judge, concurring specially.
I agree with the majority opinion that there is competent, substantial evidence in the record to support the trial court's judgment. The court cited August Tobler, Inc. v. Goolsby, 67 So.2d 537 (Fla. 1953), and although the Tobler court reached a different *6 result on different facts, it nonetheless recognized that equitable considerations can serve as a basis for ordering specific performance in spite of a default:
It is plain that as a matter of law the option fell with the default. But are there special equities in this case which render this result so unconscionable that the chancellor was in error in reaching it? To support the contention that this question should be answered in the affirmative, Tobler points out that it contemplated using the entire tract for a housing project, that it spent money in arranging for financing, and that it attempted to commence construction. But the "construction" consisted of depositing a small amount of old lumber on the land, which was done long after the default, with the property already in litigation. And it is worth noting that no benefit from this activity ever accrued to the property to make it inequitable for the Goolsbys to retain it.
Id. at 539.
There are two other circumstances which I believe support the trial court's equitable resolution. Roschman contends the reason the agreements contained a non-recordation provision was because Roschman did not want to give the public notice of the details of the agreements. Yet, the parties made a provision in the original Option Agreement for the recordation of a Memorandum of Option which specifically acknowledged the existence of the option agreement and made it available for public inspection. The memorandum provided:
Duplicate originals of the aforesaid Option Agreement, Rider, and Addendum may be seen at the offices of Roschman, 300 Northeast 30th Place, Suite 107, Fort Lauderdale, Florida 33334, or at the offices of Wallace W. Kennedy, Esq., 2929 East Commercial Boulevard, Fort Lauderdale, Florida.
Obviously, this inspection would have provided anyone with the details of the deal. Roschman conceded this public access to the agreement. In view of this undisputed public access to the option agreement, it is difficult, if not impossible, to demonstrate harm flowing from the subsequent recording.[6] In fact, Roschman testified at trial that he was not hurt by the recordation. The existence of this "other recordation" strongly supports the trial court's equitable resolution of the case under Tobler.
There is also a substantial issue as to the intent of the parties as to the non-recordation clause. There are two paragraphs from two separate documents that are at the center of this controversy: Paragraph 10 in the "Other Contract," the outright contract for sale and purchase, and Paragraph 12 in the Option Agreement. They are the paragraphs under which Roschman argued he was entitled to terminate the option upon breach of the non-recordation clause. Paragraph 10 of the contract for sale provides:
10. Neither this agreement nor any memorandum hereof shall be recorded in any public records and, if so recorded, such recordation shall, at the option of Seller, constitute a default by Purchaser entitling Seller to receive the Deposit hereinbefore *7 set forth as agreed upon and liquidated damages and to have any such recorded memorandum hereof or this Agreement expunged from the public records where same were recorded all at the cost and expense of Purchaser which cost and expense shall include, but not be limited to, reasonable attorneys' fees incurred by Seller for the services of his attorneys through and including all appeals.
Paragraph 12 of the Option Agreement provides:
12. Paragraphs 9, 11, 12, 13 and 14 of the Other Contract are hereby incorporated herein by reference as if fully set forth herein in full and, except as aforesaid with respect to the Memorandum of Option, Paragraph 10 of the Other Contract is incorporated herein by reference as if fully set forth herein in full provided that in all instances references to Seller shall be deemed references to Optionor and references as to Purchaser shall be deemed references to Optionee.
There is no express mention of "termination" as a remedy in these paragraphs as there are in other paragraphs in the agreements, such as paragraphs 4 and 7 of the Option Agreement. However, paragraph 7 of the Agreement for Purchase and Sale provides:
7. In the event of a default by Purchaser under this Agreement, Seller shall have, solely, the right to terminate this Agreement (and the Option Agreement to which this is attached as an exhibit) and shall have no right to enforce the terms of this Agreement by an action for specific performance or for actual damages. In the event of a default by Seller under the terms of this Agreement, Purchaser shall have only the right of proceeding to enforce the terms of this Agreement by an action for specific performance and Seller shall have no other or further liability hereunder.
It is undisputed that the parties did not discuss the remedy for violation of the non-recordation clause at the time they entered into the contracts. Both Mr. Ryan (S.K.) and Mr. Roschman (Roschman), the principals to the Option Agreement, testified that they did not discuss the non-recordation clause with anyone prior to the litigation of this matter, not even their attorneys.
The trial court apparently relied upon the testimony of the drafting attorneys to determine the issue of intent. S.K. contends the subjective intent of the attorneys is not material in determining what the contract was between the parties, citing two cases: Jackson v. Investment Corp. of Palm Beach, 585 So.2d 949, 950 (Fla. 4th DCA 1991) (Its what the parties actually say in the contract that is important, not what their subjective intentions may have been.); and Ace Electric Supply Co. v. Terra Nova Electric, Inc., 288 So.2d 544, 547-49 (Fla. 1st DCA 1973) ("[D]eclarations of intent, or bearing on [the parties'] intent, made by the parties prior to or at the time of the execution of the instrument," are considered to be important, as opposed to "after the fact self-serving statement[s] of [a party's] understanding of the intent ..." which are "lacking in probative force... .") (footnote omitted). A review of the portions of the transcript wherein testimony appears regarding the circumstances surrounding the drafting of the non-recordation clause reveals the subject clause was a product of the attorneys. That testimony is usually inadmissible. See In re Estate of Lenahan, 511 So.2d 365, 371-372 (Fla. 1st DCA 1987) (testimony of the draftsman of a will as to his own intent in using particular language is inadmissible to determine the testator's intent).
S.K. also contends that the trial court should have addressed the language of the actual clause, which provided for other remedies. For instance, the court did not address the absence of an omnibus termination clause allowing termination for any breach, or the presence of express termination provisions elsewhere in the agreement which demonstrates those instances where the parties intended to allow termination for particular breaches. Given the absence of admissible evidence of objective manifestations of intent by the original parties, S.K. contends that the court should have applied the usual rules of contract construction.[7] Had the trial court *8 used the analysis that S.K. suggests was appropriate, and had construed the language against the drafter, it could have held that the non-recordation clause was not intended to effect a termination of the Option Agreement, especially in view of the public access to the document provided for elsewhere as discussed above.
With regard to the purpose of the non-recordation provision, that purpose may have been compromised by S.K.'s recordation of the Option Agreement in the public records, because its purpose was apparently to avoid giving other parties notice as to the specific details of the deal. However, simply allowing S.K. to expunge the records, as the non-recordation clause itself provides, would apparently have corrected this problem, especially since there was another provision allowing public access to the option. Termination was neither specifically provided for, nor the favored alternative. Lastly, to have construed the provision not to necessitate termination would have given effect to the policy of avoiding a forfeiture.
FARMER, Judge, dissenting.
Following a trial held after our earlier decision in Roschman Properties Inc. v. S.K. Partners I, 545 So.2d 316 (Fla. 4th DCA 1989), the trial court entered judgment, finding that the intent of the parties underlying a non-recordation clause was:
"[they] intended that an unauthorized recording of the Option Agreement would constitute a default and that the default would entitle the optionor to terminate the Option Agreement."
The court went on to conclude that a later recording by counsel for SK (buyer) of the option was a violation of the agreement; that Roschman (seller) gave SK legally sufficient notice of its termination of the option to purchase; and that the seller by its conduct had not waived or estopped itself from terminating the option. At the same time, however, the court also held that the violation of the nonrecordation clause was not a material breach and that termination of the agreement would constitute a forfeiture that the law would not enforce or permit. In its final judgment, therefore, the court ordered specific performance of the option. I think we should reverse.
Although Judge Polen comments merely that the trial court's findings of fact are supported by competent substantial evidence, Judge Anstead has concluded that there is a "substantial issue as to the intent of the parties as to the non-recordation clause." His concurring opinion finds error in the trial court's reliance on the testimony of the attorneys for the principals to the transaction as to what the parties intended by the clause in issue, citing Jackson v. Investment Corp. of Palm Beach, 585 So.2d 949 (Fla. 4th DCA 1991); In re Estate of Lenahan, 511 So.2d 365 (Fla. 1st DCA 1987); and Ace Electric Supply Co. v. Terra Nova Electric Inc., 288 So.2d 544 (Fla. 1st DCA 1973). Those cases are incapable of standing for the proposition that Judge Anstead attributes to them.
Plainly neither Jackson nor Ace Electric has anything to say about the subject, so it is difficult to understand why they were even cited. In Lenahan, the issue was whether the drafter of a will could testify as to the testator's meaning behind a latent ambiguity. The opinion of the court explains its conclusion:
"Appellees in the court below argued that the draftsman's testimony was admissible as parol evidence to explain a latent ambiguity and to better effectuate and convey the declarations and intent of the testator and the circumstances surrounding the testator when the will was made. However, Grimsley's testimony extended beyond the scope of admissible parol evidence to explain a latent ambiguity. Grimsley's testimony did not concentrate of the circumstances surrounding the testator when the will was made. Rather, the bulk of Grimsley's testimony centered around his own interpretation of the terms of the will, i.e., his own intention in drafting *9 the will. The admission of Grimsley's testimony as to his own interpretation of the terms of the will violated the cardinal rule of will construction, namely, that it is the intention of the testator which governs. The search is for the testator's intention, and not that of the draftsman."
511 So.2d at 372. The court went on to hold also that the drafter's testimony could not be admitted as expert, opinion evidence under the theory that the lawyer/draftsman could assist the court in understanding the legal complexities of the case. The present case does not, of course, involve the construction of a latent ambiguity in a will. Moreover, unlike the deceased testator in Lenahan, the parties here were capable of testifying and did so.
There is a fundamental reason, however, why the Lenahan holding has no application here. The critical fact was that the lawyer/witness in Lenahan was merely a drafter of words to memorialize an intention formed and decided upon by his testator. The witness did not himself form the intention in the first instance and then simply instruct someone else to draft suitable language to memorialize the intent so formed. His testimony would have related, at best, to his understanding of what another person's intention was.
In contrast, here the witnesses did much more than merely choose words to memorialize the intent of their principals. Both of the principals to this option transaction testified that they merely agreed on the broad, general outlines of the purchase/sale and option agreement. At that point, both testified, they turned the matter over to their lawyers to negotiate the specific details of their agreement. Under these circumstances, these lawyers who negotiated the muscle and sinew of their clients' skeletal agreement had the full power to form intentions as to these specific details  just as their principals might have done for themselves without the lawyers participation in the formation of their contract.
When a principal gives an agent the power to negotiate an agreement in the first instance, the agreement so negotiated is binding on the principal just as effectively as though the principal had done it. Thomkin Corp. v. Miller, 156 Fla. 388, 24 So.2d 48 (Fla. 1945), and Stuyvesant Corp. v. Stahl, 62 So.2d 18 (Fla. 1952). A common example is the power of attorney, by which the principal gives the attorney-in-fact the authority to negotiate and effect the transaction.
In the case of an ordinary agreement negotiated directly by the parties themselves but later drafted by their lawyers, the principals are the real persons having personal knowledge  and thus capable of testifying  as to the intention of the parties in contracting. See § 90.604, Fla. Stat. (1991). Similarly, an attorney-in-fact who negotiates and concludes the agreement is the real person with personal knowledge capable of testifying as to the intention of the parties at the time of contracting where, as here, the agreement is within the scope of the authority granted by the principal. The fact that the principals may be the real parties in interest hardly yields the conclusion that the principals have personal knowledge of the intent of the parties to a contract negotiated and concluded by their attorneys-in-fact. Consequently, there is no possible justification for striking the testimony of the attorneys-in-fact in this case, and the trial judge could properly base his factual finding as to the intent of the parties on their testimony.
Turning to the separate conclusion of the trial judge here, I don't understand how a finding that the parties intended that the seller could terminate the option for a violation of the nonrecordation clause, on the one hand, and a finding that a violation of the clause is not material, on the other, can coexist. In my opinion, these are mutually exclusive propositions. If the parties intended that a recordation empowered the seller to terminate the option agreement, then they themselves have expressly agreed that a recordation constituted a material breach. It is thus not possible to square the one with the other.
Contracting parties have the power to decide for themselves just what defaults will be material and what the remedies will be in the event of such defaults. They can provide that this breach will give rise to a mild remedy, that breach a more substantial remedy, *10 and still another breach can be remedied  if the nondefaulting party should so choose  by the contractual death penalty. As our supreme court said in Nelson v. Hansard, 143 Fla. 898, 197 So. 513 (1940) (by quoting with obvious approval):
"The law permits a man to make a contract which will result in a forfeiture; and when it is clear from the terms of the contract that the parties have so agreed, a court of law as well as the court of equity, will enforce the forfeiture."
197 So. at 513-14.
In short, if the parties have expressly agreed that the nondefaulting party is entitled to terminate an entire agreement on account of a breach by the defaulting party of a specific promise, then law and equity should enforce that remedy. Thus, accepting the trial court's explicit factual finding that the parties intended to allow seller to terminate (or declare the death penalty as to the option) upon a violation of the nonrecordation clause, I should simply set aside or ignore the companion, general finding of non-materiality. I regard it as an attempt by the trial judge to rewrite the parties' agreement under the guise of factual findings or legal conclusions.
That leaves only the trial court's forfeiture conclusion as the basis for its specific performance award. The forfeiture finding is itself clouded by SK's failure in both courts to make clear precisely what it contends has been forfeited by an exercise of the entitlement to termination. Assuming that it is directed solely to the loss of the option itself, I have no difficulty in concluding that the termination of the option is a forfeiture completely enforceable in law and equity.
Although SK cites the usual array of cases for every conceivable proposition marginally relevant, it places primary reliance on two cases as establishing the power of the trial judge to declare that this termination is an unenforceable forfeiture: August Tobler Inc. v. Goolsby, 67 So.2d 537 (Fla. 1953); and Blackhawk Heating & Plumbing Co. Inc. v. Data Lease Financial Corp., 302 So.2d 404 (Fla. 1974). While both of them involve option agreements, neither one of these cases will fairly bear the proposition that SK has hung on them.
In Goolsby, the option was tied to purchase money promissory notes and a mortgage arising from the buyer's consummated purchase of other land. The option agreement provided that "if the sums of money secured by the purchase money mortgage * * * are paid when same become due, said option shall continue and remain in effect for a period of five years from the date hereof." The agreement then added:
"if there should be any default in the payment of the purchase money mortgage * * * the remainder of said option shall terminate and become null and void and of no further effect.
"* * * Anything in this Option Agreement to the contrary notwithstanding, any default in payment of [the purchase money mortgage] shall terminate and invalidate said option, and said option shall become null and void and of no further force and effect."
67 So.2d at 538. Three months after the closing, the buyer failed to make payment on the first note, and the seller immediately sued to foreclose the mortgage and for a decree declaring that the option had been validly terminated. The trial court granted the relief requested, and the buyer appealed.
The first thing to note about the supreme court's decision in Goolsby is what the court actually did. By its affirmance, the court allowed the termination of the option to stand. Addressing the option issue, the only issue raised on the appeal, the court noted that in the notes the buyer had waived any notice of a failure to make payment timely and thus any notice of intention to terminate the option. The court concluded that the option "plainly" fell with the default.
The court then proceeded to consider whether there were "special equities in this case which render this result so unconscionable that the chancellor was in error in reaching it." After rejecting the "equities" advanced by the buyer  that it had spent money in arranging for financing and had attempted to commence construction of a housing project it had planned to build on the option property  the court expressly returned *11 to ancient maxim that "equity follows the law." The court agreed with the conclusion that, according to the terms of the agreement, the option became null and void upon the default in payment and could not thereafter be reinstated. In closing, the court observed that "this Court has no power to rewrite the contract of the parties." 67 So.2d at 539.
Blackhawk is, however, a very different circumstance, quite apart from the fact that the court did not itself bar enforcement of an option. It is a very complex and detailed factual dispute, but in any event it is not necessary to restate the facts to show the distinguishing characteristic. The lower courts had refused to allow exercise of an option on the grounds that it was "so vague, indefinite and uncertain as to render the entire agreement insufficient to justify specific performance" and that the optionee "failed to properly exercise the option." 302 So.2d at 407. Neither one of these grounds is at issue on this appeal. The trial court's findings of fact have told us precisely what the parties intended as to termination for a violation of the nonrecordation clause; so there is no vagueness or uncertainty as to what they meant. Nor is any issue raised here with the trial court's finding that proper notice of termination was given before any attempt at exercise of the option. It is thus difficult for me to see the applicability of Blackhawk.
Our buyer here seeks to shelter itself in the balancing of equities which the court momentarily indulged in Goolsby. Certainly, the trial judge agreed with the buyer's forcefully advocated proposition that the equities in this case preponderated in its favor. The supreme court made plain in Goolsby, however, that equity cannot be used to disregard contractual provisions for which commercial parties have freely bargained.
We ourselves said in Bank of South Palm Beaches v. Stockton, Whatley, Davin & Co., 473 So.2d 1358 (Fla. 4th DCA 1985), that "courts of equity have no power to overrule established law." 473 So.2d at 1361 [citing Orr v. Trask, 464 So.2d 131, 135 (Fla. 1985)]. The equitable maxim that equity follows the law, we explained, "delineates the jurisprudential borders beyond which courts of equity may not venture." 473 So.2d at 1361. That means, we added, that "[c]ourts of equity simply have no power to issue rulings which they consider to be in the best interests of justice without regard to established law." Id.
The established law or rule of decision is that parties are ordinarily held to their bargains. When they have reduced their engagements to writing and manifested their assent to such engagements, the law will almost always enforce them. The law does not concern itself, at least as to commercial parties, with whether the bargain is a burden to one of them or whether the bargain proves improvident or whether in hindsight a particular provision has onerous implications that, if thought about at the time of contracting, the party might not have accepted.
The law requires predictability in order to afford stability to commercial relations. That means to me that the expressed intent of the parties should be enforced, unless there is an unusually good reason not to do so. Reasons which could have been foreseen do not usually qualify to make the exception. There is no doubt in my mind that SK could have foreseen that a negligent recordation four years after contracting and just before exercise of the option could find it having expended substantial sums in preparation for an exercise of the option that might be lost. Yet it still agreed that the seller could without limitation terminate for a breach of the nonrecordation clause. I simply cannot agree that this circumstance, which it is charged with knowing could happen, is an excuse to avoid the termination.
Here, our would-be buyer effectually asked the court to treat the seller's asserted right of termination as subject to an after-the-fact "fairness" analysis. Termination should be denied, it argues, because SK cannot be restored to the status quo ante. It had spent nearly $2.5 million, over the four years between contracting and the termination, making ready to exercise the option. As I have just observed, however, the costs of making ready were clearly foreseeable  indeed, they were specifically contemplated by the parties. It was equally obvious prospectively that termination *12 would render these costs potentially unrecoverable.
In my opinion, the effect of the court's decision (both below and here) is to read the agreed entitlement to termination right out of the agreement. I know of no basis for such an excision. Although SK's violation of the recordation clause was not intentional, being rather the negligent act of its agent, a pure heart does not relieve a contracting party of the agreed consequences for its breach. As the court said in Reitano v. Fote, 50 So.2d 873 (Fla. 1951):
"`While forfeitures are not favored, either in law or equity, it is equally true that neither law nor equity favors the negligent, nor do they hold out a premium to the careless, or one who shows anything else than a prompt and ready disposition to comply with his undertaking.'"
50 So.2d at 874 [quoting from Realty Securities Corp. v. Johnson, 93 Fla. 46, 111 So. 532, 536 (1927)]. I note, not without purpose, that both Reitano and Realty Securities involved the termination of option agreements and both were upheld on appeal.
To the assertion that the abuse of discretion standard of review applies to this judgment employing the equitable remedy of specific performance of the option, it is entirely sufficient to refer to Howard Cole & Co. v. Williams, 157 Fla. 851, 27 So.2d 352 (1946), where the court said in response to the identical argument in indistinguishable circumstances:
"We recognize the rule that the granting or withholding of a decree for specific performance rests largely in the discretion of the Chancellor but the right to exercise this judicial discretion does not extend to the power or authority to contravene the legal requirements which must exist to give a litigant grounds upon which he may invoke the remedy."
27 So.2d at 356. In Howard Cole & Co., the court upheld the dismissal of an action by a similarly negligent optionee seeking specific performance of a terminated option contract.
I see no choice but to reverse and remand for the entry of a decree in favor of the seller and against SK, the putative buyer. It follows that I should also reverse the award of property taxes. I therefore dissent.
NOTES
[1] Roschman owned the option property. On April 15, 1981, Roschman entered into an agreement for purchase and sale in which it agreed to sell to Eastwood Park, Inc. (S.K.'s predecessor in interest) 660 acres adjacent to the option property for $5 million. As part of the same transaction, the same parties concurrently entered into the Option Agreement on the four parcels of land adjacent to the 660 acres, which is the subject of this litigation, and a Rider to both the Agreement for Purchase and Sale and the Option Agreement. Through a series of assignments, these option rights were ultimately transferred to S.K.
[2] The court wrote:

It is plain that as a matter of law the option fell with the default. But are there special equities in this case which render this result so unconscionable that the chancellor was in error in reaching it? To support the contention that this question should be answered in the affirmative, Tobler points out that it contemplated using the entire tract for a housing project, that it spent money in arranging for financing, and that it attempted to commence construction. But the `construction' consisted of depositing a small amount of old lumber on the land, which was done long after the default, with the property already in litigation. And it is worth noting that no benefit from this activity ever accrued to the property to make it inequitable for the Goolsbys to retain it.
67 So.2d at 539.
[3] See e.g. Wolfle v. Daugherty, 103 Fla. 432, 137 So. 717 (1931) (an option confers no equitable interest in real property until it is exercised); South Investment Corp. v. Norton, 57 So.2d 1 (Fla. 1952) ("An option contract is not a contract of sale within any definition of the term; it is a unilateral contract which gives the option holder the right to purchase under the terms and conditions of the option agreement. Thus, if such terms and conditions are not met by the option holder, the unilateral contract does not become a bilateral contract...."); Baker v. Coleman, 160 Fla. 297, 34 So.2d 538 (Fla. 1948) (an option is a continuing offer on the part of the optionor to sell; the offer is accepted and becomes a binding contract only when the optionee exercises the option exactly by its terms).
[4] S.K. declined the trial court's offer to award it the rents and profits Roschman earned related to the property during the litigation, as a set-off against the $300,000-plus S.K. paid in property taxes during that same period.
[5] The damages to S.K. during the four-plus years that Roschman delayed the contract's performance stemmed from the fact that S.K. was precluded from proceeding with its plans to build a shopping center on the property and sell other portions of the property at a profit.
[6] S.K. presented evidence that the document entitled "Option Agreement" was recorded in a "confused and disordered state" in the Public Records of Martin County as part of Exhibit "B" to an original document entitled "Assignment of Option." According to S.K., Jary Stretwieser, at that time an attorney with Gunster, Yoakley, who represented S.K., prepared the Assignment of Option. It was prepared and recorded in the Public Records of Martin County in connection with a transaction wherein Mr. Kennedy (who at one time owned, as trustee, a one-half interest in the Option Agreement), assigned a portion of his option rights in exchange for $670,000 to Nebhart, Inc. The "Option Agreement," but not the other documents comprising that agreement, was attached in a "confused and disordered state" as an exhibit to the original assignment. He states that Streitwieser utilized a practice often employed by attorneys when preparing assignments of contract rights  he simply attached to the Assignment the contract document itself and referred to it by reference. Thus, S.K.'s attorney "inadvertently," and without any intention of running afoul of the non-recordation clause, caused to be recorded a copy of the document entitled "Option Agreement," which was but one of five documents that comprised S.K.'s and Roschman's agreement. Two of the five have never been recorded. Two other of those documents were drafted by Roschman's attorney, executed and caused to be recorded in the public records by Roschman. Thus, the complete agreement has never been recorded, but parts have been. Most of these recorded parts were recorded by Roschman.
[7] (1) an ambiguous provision is construed most strongly against its drafter, which is presumed to be the party for whose benefit such provision was included, Capital City Bank v. Hilson, 59 Fla. 215, 51 So. 853, 855 (Fla. 1910); (2) intent should be determined in light of the object or purpose to be attained by the subject provision, 11 Fla.Jur.2d Contracts § 107 (1979); and (3) an ambiguous provision should be construed where possible to avoid a forfeiture, id. at § 168.